T.C. Memo. 1996-66

UNITED STATES TAX COURT

GERALDINE H. PEARSON, Petitioner <u>v</u>. COMMISSIONER OF
INTERNAL REVENUE, Respondent

Docket No. 14580-92.      Filed February 20, 1996.

<u>Marc K. Sellers</u>, for petitioner.

<u>Ann M. Murphy</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

COLVIN, <u>Judge</u>:  Respondent determined deficiencies in
petitioner's Federal income tax of $2,681 for 1988, $5,338 for
1989, and $4,071 for 1990, and additions to tax of $134 for 1988
for negligence under section 6653(a) and $770 for 1989 and $574
for 1990 for failure to timely file under section 6651(a).

After concessions,[1] the sole issue for decision is whether petitioner operated her farm with an actual and honest profit objective in 1988, 1989, and 1990. We hold that she did not.

Section references are to the Internal Revenue Code in effect for the years in issue. Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

A. Petitioner

Petitioner lived in Oregon City, Oregon, when she filed her petition. Petitioner's parents and grandparents were farmers. Petitioner is experienced and knowledgeable about farming. She learned how to handle farm animals and equipment and how to ride and show horses competitively when she was a teenager. At age 14, petitioner was designated to manage her family's farm while her father served in World War II. Petitioner has lived on a farm since 1949. Petitioner qualified and was nominated for the American Olympic Equestrian Team in 1952.

Petitioner graduated from the University of Oregon in 1953. She taught riding and philosophy in Pennsylvania from 1953 to 1955. Petitioner worked on a Montana cattle ranch during part

---

[1] Petitioner conceded that she is not entitled to deduct $5,475 for employee business expenses that she claimed on her 1988 return. Respondent conceded that petitioner is not liable for additions to tax under sec. 6651 for 1989 and 1990 or under sec. 6653(a) for 1988.

of 1955.  From 1955 to 1959, she held short-term or part-time positions with several employers including KGON radio, H. Richard Sellars Advertising, BG Record Distributors, White Stag Manufacturing, Hood River Distillers, and Enterprise Courier.

Petitioner has raised livestock since 1955.  From 1955 to the time of trial, petitioner's farm activities included caring for cattle and sheep and breeding, showing, and selling horses.

Petitioner's farm consists of her parents' 47.6 acre farm, which they gave her in 1976, 100 acres petitioner bought in 1961, which adjoin her parents' farm, and 3 acres petitioner has leased since 1986.  Petitioner used the 150.6 acres as a farm from 1986 until the time of trial.  The farm consists entirely of pasture land.  Petitioner's farm is in Oregon City, Oregon.

Petitioner taught at Mt. Angel College from 1959 to 1969 and at Portland Community College from 1969 to 1986.  During the first years petitioner taught 6 hours per week.  After several years of teaching, petitioner did special projects at home or at other locations not disclosed in the record.  In 1971 or 1972, petitioner had a 180-day contract as a member of the staff of the president of Portland Community College.

In 1986 and 1987, petitioner took a leave of absence from teaching to pursue graduate work at Oregon State University. Petitioner lived on her farm and commuted 2 days each week to school. Petitioner spent 1 year on her farm writing her

dissertation.  Petitioner has never employed anyone to help her with the farm.

Petitioner has managed horse shows and trials, worked on farms in Oregon and Montana, acted as an agent in the sale of cattle, sheep, and horses, managed a 2,000-head experimental goat herd for the Oregon Health Sciences Center, and raised and sold horses to the American Olympic Team.

Petitioner decreased her cattle and sheep holdings in 1985 because market conditions were poor.  She expanded her operations in 1988 to include horticultural products.  There are two houses on petitioner's farm.  Petitioner lived in one and rented the other to Carl Schaeffer (Schaeffer) in 1988.  Schaeffer was not a farmer.  Schaeffer lived at the house for less than 1 year.

During the years in issue, petitioner had about 150 sheep, 20 to 25 head of cattle, and 40 tons of hay on her farm. Petitioner kept 8 to 10 horses on the farm for breeding. Petitioner worked full time on her farm during academic breaks and summers.  During the school year, petitioner did farm work mornings and evenings during the week and all day on weekends. Petitioner cut, raked and bailed hay, hauled manure, reseeded pastures, trimmed, weeded, sprayed, irrigated, maintained the barn, repaired buildings and fences, bought and sold hay and grain, and cultivated.  Petitioner also fed, castrated, docked, inoculated, trained, marketed, shipped, and sold her livestock.

B.   Petitioner's Employment in Virginia

In June 1988, petitioner signed a 5-year contract to serve as headmistress of the Foxcroft Girls' Academy (Foxcroft) in Middleburg, Virginia.  At that time petitioner intended to remain in Virginia for 5 years.

Before leaving for Foxcroft, petitioner entered into an oral contract with Jan Stockfleth (Stockfleth).  Stockfleth owned a farm in Canby, Oregon.  Stockfleth agreed to supervise and maintain petitioner's livestock operation.  Petitioner agreed to give Stockfleth the hay, the proceeds of the wool crop, and one-half of the proceeds of the lamb crop.  Petitioner received the other half of the proceeds of the lamb crop.  Petitioner agreed to pay any extraordinary expenses such as veterinary bills. Petitioner did not agree to pay Stockfleth a salary or fee. Stockfleth, however, billed petitioner $1,740.63 for her services.  Petitioner paid this amount.

Stockfleth visited petitioner's farm twice a week while petitioner was in Virginia.  During lambing season, Stockfleth or her daughter visited petitioner's farm every day.

Other friends and neighbors of petitioner also helped or were available to help with the farm if there were any emergencies.  Darrel Terry, a neighboring farmer, was available for emergency assistance for the cattle.  Terry Tosney, a neighboring farmer, was available to help with the sheep. Elizabeth Dixon (Dixon), a friend, cared for the horses.

Petitioner called Dixon a couple of times from Virginia to discuss the farm. Petitioner called the people responsible for her farm at least twice a week while she was in Virginia.

Petitioner sold a horse named Fraulein Oneonta for $1,200 to an Oregon buyer in June 1988. Petitioner began working at Foxcroft on July 1, 1988. Petitioner left some unmarketable horses in Oregon and took four horses to Virginia. Petitioner intended to have the horses she left behind shipped to her to sell after they attained marketable age.

Petitioner was injured in September 1988. She suffered from reflex sympathetic dystrophy and could not complete her duties as headmistress of Foxcroft. In January 1989, the Foxcroft board of directors relieved petitioner of her position. Petitioner entered into a termination agreement with Foxcroft on February 12, 1989.

C.   Petitioner's Post-Foxcroft Activities

Petitioner lived at Salem Farm in Upperville, Virginia, from March to May 1989. Petitioner went to her farm in Oregon twice between January and May 1989.

In May 1989, petitioner permanently returned to her farm. Petitioner gave two horses to Gerth Christensen (Christensen) in August 1989. The record does not indicate why petitioner gave the horses to Christensen.

From 1990 until the time of trial petitioner received pension payments, completed some consulting contracts, and taught

some classes. Petitioner bought equipment to help her avoid injury from her physical condition. Petitioner made capital and fencing improvements, cared for cattle and sheep, marketed horses, and expanded operations to include horticultural products. Petitioner suffered unexpected losses during the years in issue including theft of livestock, a decline in the sheep market, and unanticipated repairs. Petitioner's farm was producing cattle, sheep, and hay at the time of trial.

D.    Petitioner's Records, History of Losses, and Tax Returns

Petitioner did not have a separate bank account for her farm. Petitioner marked an asterisk on stubs of checks she used for farm expenses. She maintained a separate ledger for her farm. Petitioner's farm records were adequate to prepare her tax returns. Petitioner did not keep or analyze her records to evaluate how her farm performed.

Petitioner reported no Federal income tax liability from 1985 until the time of trial. Petitioner's tax returns were prepared by William Holdner, a certified public accountant (C.P.A.). Petitioner had income, deductions, and net farming losses as shown in the chart below:[2]

| Year | Income | Deductions Before Depreciation | Net Loss Before Depreciation | Depreciation | Net Loss Including Depreciation |
|------|--------|-------------------------------|------------------------------|--------------|--------------------------------|
| 1985 | $20,461 | $31,191 | $10,730 | $7,682 | $18,412 |
| 1986 | 8,855 | 30,640 | 21,785 | 8,536 | 30,321 |
| 1987 | 3,019 | 29,389 | 26,370 | 7,061 | 33,431 |

[2] The amounts for 1985 to 1993 are correct in the stipulation but the totals are incorrect. The totals here are correct.

| 1988 | 3,825 | 25,426 | 21,601 | 5,803 | 27,404 |
| 1989 | 11,028 | 42,260 | 31,232 | 5,508 | 36,740 |
| 1990 | 1,622 | 28,744 | 27,122 | 6,138 | 33,260 |
| 1991 | 39,499 | 42,042 | 2,543 | 8,550 | 11,093 |
| 1992 | 17,480 | 37,227 | 19,747 | 10,307 | 30,054 |
| 1993 | 6,985 | 24,341 | 17,356 | 6,107 | 23,463 |
| | 112,774 | 291,260 | 178,486 | 65,692 | 244,178 |

Petitioner lost money on her farm in 36 of the 37 years that she operated it.

OPINION

A.  Requirement That Petitioner Have a Profit Objective

Section 183(c) disallows certain deductions for activities not conducted for profit.  In this context, "profit" means economic profit, independent of tax savings.  Herrick v. Commissioner, 85 T.C. 237, 255 (1985); Seaman v. Commissioner, 84 T.C. 564, 588 (1985); Surloff v. Commissioner, 81 T.C. 210, 233 (1983).  An activity is conducted for profit if the taxpayer engages in the activity with an actual and honest profit objective.  Surloff v. Commissioner, supra; Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without published opinion 702 F.2d 1205 (D.C. Cir. 1983).  The burden of proof is on the taxpayer.  Golanty v. Commissioner, 72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981).  We give greater weight to objective facts than to a taxpayer's statement of intent.  Cherin v. Commissioner, 89 T.C. 986, 992 (1987); Seaman v. Commissioner, supra.

B.  Whether Petitioner Had a Profit Objective

Section 1.183-2(b), Income Tax Regs., lists nine factors we may consider in deciding whether an activity is engaged in for

profit. These factors are: (1) The manner in which the taxpayer conducts the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the success of the taxpayer in carrying on other similar or dissimilar activities; (5) the taxpayer's history of income or loss with respect to the activity; (6) the amount of occasional profit, if any, which is earned; (7) the expectation that the assets used in the activity may appreciate in value; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. No single factor controls. Abramson v. Commissioner, 86 T.C. 360, 371 (1986); Golanty v. Commissioner, supra.

1. Manner in Which the Taxpayer Conducts the Activity

Conducting an activity similarly to comparable businesses which are profitable may indicate that a taxpayer engaged in the activity for profit. Engdahl v. Commissioner, 72 T.C. 659, 666-667 (1979); sec. 1.183-2(b)(1), Income Tax Regs. Maintenance of complete and accurate records may indicate that the taxpayer has a profit objective. Elliott v. Commissioner, 90 T.C. 960, 971-972 (1988), affd. without published opinion 899 F.2d 18 (9th Cir. 1990).

Petitioner contends that her activities were businesslike because she maintained a separate ledger for her farm, made notations on her checks indicating that they were for business expenses, and had a C.P.A. prepare her tax returns. We disagree.

Petitioner did not use her records to evaluate how her farm performed. When asked if her farm was profitable based upon its history of income and expenses, petitioner testified as follows:

> I just don't know that I am really capable of analyzing
> those figures. It's not my field at all. I really
> hate to get into something that is so alien to me as
> accounting, * * * that's why I've always given * * *
> all my things to an accountant to do. I've never made
> out my own income tax returns. I really don't * * *
> feel capable of even analyzing these charts * * *

Petitioner testified that her position at Foxcroft increased her ability to sell her horses. We disagree. Petitioner sold a horse 1 month before becoming the headmistress of Foxcroft to an Oregon buyer and gave two horses away in August 1989, but she did not introduce any convincing evidence that she tried to sell horses in Virginia. Petitioner's agreeing to a 5-year commitment in Virginia and her failure to show that she tried to sell her horses while in Virginia detract from her claim that she ran her farm with a profit objective.

Petitioner contends that the fact that she reduced the amount of her livestock in 1985 in response to changing market conditions and added horticultural products in 1988 shows that she had a profit objective. Petitioner introduced no evidence that these changes produced any income. It is true that the discontinuation of an unprofitable operation may suggest that the activity was conducted in a businesslike manner. See Seebold v Commissioner, T.C. Memo. 1988-183. However, petitioner's reduction of her livestock in 1985 and her addition of horticultural products in 1988 are not sufficient changes in her

operations to show that she had a profit objective.  Petitioner has not shown that she ran her farm in a manner similar to comparable businesses.

This factor favors respondent.

2. <u>The Expertise of the Taxpayer or the Taxpayer's Advisers</u>

Efforts to gain experience and a willingness to follow expert advice can indicate that a taxpayer has a profit objective.  See <u>Engdahl v. Commissioner</u>, <u>supra</u> at 668. Respondent concedes that petitioner has farming expertise. This factor favors petitioner.

3. <u>The Taxpayer's Time and Effort</u>

The fact that a taxpayer devotes a substantial amount of time and effort to conduct an activity may indicate that the taxpayer has a profit objective.  Sec. 1.183-2(b)(3), Income Tax Regs.  However, the fact that a taxpayer devotes little or no time to an activity does not necessarily mean that the taxpayer lacks a profit objective if the taxpayer arranges for qualified persons to carry on the activity.  Sec. 1.183-2(b)(3), Income Tax Regs.; see <u>Hughes v. Commissioner</u>, T.C. Memo. 1989-528; <u>Palmer v. Commissioner</u>, T.C. Memo. 1981-354.

Petitioner devoted a substantial amount of time to farm activities while she was in Oregon.  Petitioner estimated that she spent 1,560 hours in 1988, 1,800 hours in 1989, and 3,600 hours in 1990 working on the farm.  She estimated that she worked 5 hours per day on days that she worked away from the farm, and

10 hours per day during weekends, vacations, and other days that she had no outside work.

In contrast, petitioner devoted relatively little time and effort to her farm from July 1, 1988, to May 31, 1989, when she was in Virginia. Petitioner contends that her moving to Virginia does not show that she lacked a profit objective because she arranged for friends to manage her farm. She testified that she contacted "persons responsible for the various farm operations and livestock in her absence" by telephone at least twice a week while in Virginia. Stockfleth visited petitioner's farm twice a week. During lambing season, Stockfleth or her daughter visited petitioner's farm every day.

We cannot reconcile the small amount of time Stockfleth (or anyone else) spent at the farm during petitioner's absence with the substantial amount of time petitioner estimated she spent working on the farm. If petitioner spent the time working on the farm stated above, then it appears that the arrangement with Stockfleth and petitioner's neighbors was inadequate. Conversely, if Stockfleth's occasional visits and the availability of others to help in emergencies were sufficient to run the farm, petitioner has not adequately explained why she had to devote as much time to the farm as she did.

This factor favors petitioner somewhat.

### 4. Taxpayer's Success in Other Activities

The fact that a taxpayer has previously engaged in similar activities and converted them from unprofitable to profitable may

indicate that he or she has a profit objective, even though the activity is presently unprofitable. Sec. 1.183-2(b)(5), Income Tax Regs.

Petitioner points out that she has successfully managed horse shows and trials, worked on farms in Oregon and Montana, acted as an agent in the sale of cattle, sheep, and horses, managed a 2,000-head experimental goat herd for the Oregon Health Sciences Center, raised and sold horses to the American Olympic Team, and was nominated for the American Olympic Equestrian Team.

Petitioner has had many impressive accomplishments. However, she has not shown that she operated businesses profitably or converted similar activities from unprofitable to profitable. Sec. 1.183-2(b)(5), Income Tax Regs. Petitioner has not introduced any credible evidence that any of her prior endeavors were financially successful.

This factor favors respondent.

5. Taxpayer's History of Income or Losses

A history of substantial losses may indicate that the taxpayer did not conduct the activity for profit. Golanty v. Commissioner, 72 T.C. at 427; sec. 1.183-2(b)(6), Income Tax Regs. However, a taxpayer may have a profit objective even if the activity has a history of losses without any profit. Bessenyey v. Commissioner, 45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967).

Petitioner's farm generated substantial losses. From 1985 to 1993, petitioner's farm lost $178,486 not counting

depreciation and $244,178 counting depreciation. During the years in issue (1988 to 1990), petitioner lost $79,955 not counting depreciation and $97,404 counting depreciation.

Craig Gee (Gee), the revenue agent who audited petitioner's returns, testified that petitioner said during the audit that she had a profit in only 1 of the 37 years she ran the farm. That profit was for a year in the 1970's. Gee's testimony was based on his contemporaneous written notes. Petitioner said that she did not recall making this statement. We see no reason to doubt Gee's testimony in light of the fact that he based it on contemporaneous notes and petitioner has no contrary recollection.

This factor strongly favors respondent.

6. Amount of Occasional Profits, If Any

Small occasional profits with large continuous losses may indicate that a taxpayer does not have a profit objective. Sec. 1.183-2(b)(7), Income Tax Regs. Petitioner had no profits in any year from 1985 to 1993, and she apparently had a profit in only 1 of the 37 years she ran the farm.

Petitioner correctly contends that a profit objective may be present even if there is no profit, and that she must have only an actual and honest profit objective, not a reasonable expectation of profit. Petitioner cites Siegal v. Commissioner, T.C. Memo. 1992-334. In Siegal, the taxpayers bought a deteriorated citrus grove and an overgrown pasture. The taxpayers put the property into good condition. Although the

taxpayers had losses from 1976 to 1986, we held that they had a bona fide profit objective during the years in issue, 1982 to 1984.  Id.  Respondent's case is much stronger here than in Siegal v. Commissioner, supra.  Petitioner's farm had no profitable years from 1985 to 1993 and had a profit in only 1 year out of the 37 years that she operated it.

Petitioner contends that she made money from selling three horses:  (1) Good Mixture in 1972 or 1973 for $18,000; (2) Rimrock in 1977 for $7,000; and (3) Thatcher in 1991 for $35,000.[3]  Petitioner's claim that these sales show that she had a profit objective is unconvincing.  Those isolated sales, in view of her losses, do not show that she operated the farm with a profit objective.

Petitioner points out that she had unexpected losses during the years in issue from the theft of livestock, a decline in the sheep market, and unanticipated equipment repairs.  Unforeseen losses beyond the control of the taxpayer are considered in deciding whether the taxpayer conducted the activity for profit.  Sec. 1.183-2(b)(6), Income Tax Regs.  Petitioner has not shown, however, that without these losses her farm would have been profitable.

This factor favors respondent.

_____

[3] Petitioner also sold Fraulein Oneonta for $1,200 in 1988.

7. Taxpayer's Expectation of Appreciation in Value

Whether the taxpayer expects the property used in the activity to appreciate in value is considered in deciding whether the taxpayer has a profit objective. Faulconer v. Commissioner, 748 F.2d 890, 898-899 (4th Cir. 1984), revg. T.C. Memo. 1983-165; see Lemmen v. Commissioner, 77 T.C. 1326, 1341-1342, 1342-1343 n.22 (1981). A taxpayer may intend to derive a profit from an activity, even if the activity is not currently profitable, if the taxpayer expects income from the activity and appreciation of the assets used in the activity to exceed the expenses of the activity. Sec. 1.183-2(b)(4), Income Tax Regs.

Petitioner contends that, counting appreciation in the value of her land, she has shown that she had an actual and honest profit objective. We disagree because she has not proven that the appreciation in the value of her farm plus farm income exceeded her farm losses or that she expected it to do so.

Petitioner submitted, at best, inconclusive evidence about the value of the 100 acres of land she bought in 1961 for $10,000.

Petitioner offered a letter from A.J. Caragol, Sr., an associate broker with the residential real estate department of Coldwell Banker (Caragol letter). The Caragol letter stated that the fair market value of petitioner's farm is $555,000. The letter is not dated, it does not state the fair market value of petitioner's parents' land when she received it, it does not state how the land was appraised, and it does not distinguish

between the value of the land and the improvements to the land. We did not admit the Caragol letter into evidence because it was not available at trial, much less 15 days before trial, as required by the standing pretrial order.[4]

It is important for us to know the fair market value of petitioner's land when she acquired it because without that value we would be comparing the fair market value of petitioner's 147.6 acres during the years in issue to the $10,000 petitioner paid for 100 acres in 1961. Such a comparison inflates the appreciated value of petitioner's farm. The value of the land when petitioner acquired it is the amount for which she could have sold the land if she did not farm it. We evaluate how much the land appreciated while she farmed it.

Even if we had admitted the Caragol letter into evidence, it would not have shown how much petitioner's land has appreciated while she operated the farm. The record does not show the fair market value of the 147.6 acres when petitioner acquired it and there is no evidence about how Caragol made the estimate.

The Clackamas County Department of Assessment and Taxation sent several letters to petitioner in 1994 which give the "real market land value" of petitioner's land on October 14, 1994. The letters do not define "real market land value", and we do not know how it compares to fair market value.

---

[4] The Court gave petitioner an opportunity to seek a stipulation with respondent after trial relating to the admission of documents such as this letter. The parties did not so stipulate.

Petitioner's land is listed by the Clackamas County Department of Assessment and Taxation as four separate lots. The following chart shows the assessed values of the lots in 1974 and 1992:

| Lot | Acres | 1974 Assessed Value | 1992 Assessed Value |
|------|--------|---------------------|---------------------|
| 1000 | 44.01 | Not in record | $118,390 |
| 1090 | 3.80 | $300 | 220 |
| 1600 | 60.00 | 12,600 | 11,100 |
| 1690 | 40.00 | 7,680 | 5,710 |
| | 147.81 | 20,580 | 135,420 |

We cannot meaningfully compare these figures because the record does not contain the 1974 assessed value for lot 1000.

Petitioner testified that the assessed value of her farm increased by $319,490 from 1974 to 1994. Petitioner's calculation, however, mixes apples with oranges. Petitioner subtracted the assessed value for 1974 from the 1994 "real market land value". While the record does not define "real market land value", we know that it is different than assessed value because the tax statement issued by the Clackamas County Tax Collector lists these values separately.

Even if petitioner's land appreciated by $319,490 from 1974 to 1994, petitioner has not shown that amount exceeded her losses. Petitioner's net losses from 1985 to 1993 were $178,486 not counting depreciation and $244,178 counting depreciation. The record does not show the amount of petitioner's losses before 1985. We do not speculate as to the amounts of petitioner's losses before 1985, but we note that petitioner had losses in 36

out of 37 years.  Petitioner has not shown that she in fact ever considered whether land appreciation would more than offset her losses, much less that it did so.

This factor favors respondent.

8.  Financial Status of Taxpayer

Substantial income from sources other than the activity, especially if the losses generate substantial tax benefits, may indicate that the taxpayer is not conducting the activity for profit.  Sec. 1.183-2(b)(8), Income Tax Regs.

Petitioner contends that, because she is not wealthy, her purpose in having a farm was not to offset substantial income from other sources.  We disagree.  While petitioner is not wealthy, her farm losses enabled her to avoid paying Federal income taxes from 1985 to 1993.  Petitioner's farm losses compared to her other income[5] are as follows:

| Year | Schedule F Losses | Nonfarm Income |
|------|-------------------|----------------|
| 1985 | $18,412 | $26,813 |
| 1986 | 30,321 | 34,404 |
| 1987 | 33,431 | 28,578 |
| 1988 | 27,404 | 43,652 |
| 1989 | 36,740 | 28,917 |
| 1990 | 33,260 | 24,368 |
| 1991 | 11,093 | 17,034 |
| 1992 | 30,054 | 39,791 |
| 1993 | 23,463 | 14,795 |
| | 244,178 | 258,352 |

---

[5] This includes gross income from Foxcroft, Oregon State Board of Higher Education, interest and dividend income, and income from pensions from the State of Oregon Public Employees Retirement System and Portland Community College.

For the 9 years for which we have petitioner's tax returns, petitioner's nonfarm income exceeds her farm losses by only $14,174. Petitioner's farm losses have generated substantial tax benefits.

This factor favors respondent.

9. Elements of Personal Pleasure

The presence of recreational or personal motives in conducting an activity may indicate that the taxpayer is not conducting the activity for profit. Sec. 1.183-2(b)(9), Income Tax Regs.; see Faulconer v. Commissioner, 748 F.2d at 901; Jackson v. Commissioner, 59 T.C. 312, 317 (1972) (suffering is not a prerequisite to deductibility). However, for losses from an activity to be deductible, the taxpayer's objective in conducting the activity must be to realize a profit. Bessenyey v. Commissioner, 45 T.C. at 274.

Petitioner testified that she did not farm for fun, but we think the objective facts show otherwise. She suggested no reason other than enjoyment to explain why she conducted an activity which lost money for 36 out of 37 years.

This factor favors respondent.

C. Conclusion

While no one factor controls, Abramson v. Commissioner, 86 T.C. at 371, we find it significant that petitioner's farm had a long history of losses, that petitioner derived substantial tax benefits from these losses, and that petitioner left her farm in

Oregon to work in Virginia.  We hold that petitioner did not operate her farm for profit in 1988, 1989 and 1990.

To reflect the foregoing and concessions,

<u>Decision will be entered</u>

<u>under Rule 155</u>.